IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

RICHARD H. CAREY,

    Petitioner,                   No. CIV S-07-1642 MCE CHS P

    vs.

D.K. SISTO, Warden,

    Respondent.               FINDINGS AND RECOMMENDATIONS

_____/

I.    INTRODUCTION

        Petitioner Richard Carey is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Carey challenges the March 9, 2006, decision by the Board of Parole Hearings (hereinafter Board) finding him unsuitable for parole. Upon careful consideration of the record and the applicable law, the undersigned will recommend that this petition for habeas corpus relief be denied.

II.    FACTUAL AND PROCEDURAL BACKGROUND

    A.    Facts

        The Board recited the facts of Carey's commitment offense as follows:

        PRESIDING COMMISSIONER FARMER: The summary in the
        Board report reads as follows,

1

| | |
|---|---|
| 1 | "On November 17th, 1994, at approximately 10:30 p.m. the subject had an argument with the victim and then left the |
| 2 | victim's residence. Subject later returned to the residence and attacked the victim. Using a clawed framing hammer, |
| 3 | he struck the victim in the head and facial area numerous times. After the assault, subject robbed the victim of 17 |
| 4 | dollars, the victim's handgun, and fled the scene in the victim's car. The subject later returned, I assume it's to the |
| 5 | victim's residence, at approximately 7:00 a.m. on November 18th, 1994. The subject then fled the scene again |
| 6 | without administering aid or assistance to the victim. The subject turned himself in to the sheriff's office later that |
| 7 | day and confessed to the crime. As a result of the assault, the victim suffered extensive injuries. The injuries |
| 8 | included a depressed skull fracture, severe permanent disfigurement to his right ear and left side of his face. His |
| 9 | right ear had to, his right ear had to be amputated. The victim was left with extensive deep scarring to the right |
| 10 | side of his facial and head area. He experienced paralysis to his left side due to severe neurological damage to the |
| 11 | right side of his brain. He sustained severely impaired oral motor movements. The victim endured facial |
| 12 | reconstructive and neurological surgery. His surgeon, Dr. F. Mantzmaxillo, spelled M-AN-T-Z-M-A-X-I-L-L-0, was |
| 13 | quoted as describing the victim's injuries as the worst depressed skull fracture he had seen in 20 years of practice |
| 14 | where the patient survived the injuries." |

15  And again, that comes from, that summary is obtained from the
    probation report. The prisoner's version is then summarized from
16  that same report in the Board report as follows. . . .

17  "He stated that after having an argument with the victim, he
    felt that a physical confrontation was about to ensue. He
18  grabbed a hammer and hit the victim with it. After
    realizing what he had done, he fled the scene of the crime.
19  He claims that he went back to the scene of the crime to
    check on the victim, but quote, 'freaked out,' closed quote,
20  all over again when he entered the house. He claims that
    he wanted to commit suicide over what he, I assume, [did]
21  to his friend but could not go through with it. He then
    surrendered himself to authorities. Subject says that he
22  takes full responsibility for the crime and contributes his
    state of mind at the time of the crime to his alcohol and
23  drug abuse, drug use, I'm sorry."

24 Docket Number 23 ("DN 23"), transcript of the Board's March 9, 2006 hearing, at 21-23.

25          Carey was convicted of aggravated mayhem and sentenced to a term of seven

26 years to life. Answer, Exhibit at 116. On March 9, 2006, the Board held Carey's Subsequent

Parol Consideration Hearing. DN 23 at 4. At the conclusion of that hearing the Board found him unsuitable for parole. DN 23 at 85.

      B.      Habeas Review

On or about October 15, 2006, Carey filed a petition for writ of habeas corpus in the Tuolomne County Superior Court. Answer, Ex. at 2-13. That petition was denied on November 22, 2006, in a brief but reasoned opinion. Answer, Ex. at 68-69. Carey then filed a petition in the California Court of Appeal, Third Appellate District on December 27, 2006. Id. at 71. That petition was denied on May 3, 2007, in a short but reasoned opinion. Id. at 143.

Carey next filed a petition for review in the California Supreme Court on May 11, 2007. Id. at 151. That petition was summarily denied on June 13, 2007. Id. at 160. Finally, Carey filed this federal petition on August 10, 2007.

III.      APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on

> the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

/////

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001). The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

IV.     DISCUSSION OF PETITIONER'S CLAIM

All of Carey's arguments rely on a claim of the denial of Constitutional due process.[1]

    1)     Description of Claim

Carey argues that the Board's decision violated his right to due process because it was based solely on the circumstances of the commitment offense, was not supported by some evidence, and did not reflect an "individualized consideration of the specified criteria." Petition at 5-6.

    2)     State Court Opinion

The Tuolomne County Superior Court rejected this claim finding that Carey's "contention is not supported by the transcript of the hearing." Answer, Ex. at 138. That holding was affirmed by the California Court of Appeal which stated that "the record, as presently constituted, does not support petitioner's contentions." Id. at 143.

---

[1] Carey's petition contains eight grounds. Grounds one, two and three all concern arguments about the denial of Constitutional due process and will therefore be discussed as one claim. Grounds four through eight were previously dismissed by the Honorable Morrison C. England, Jr., United States District Judge. Docket Entries nine and fifteen.

3) <u>Applicable Law</u>

The Due Process Clause of the Fourteenth Amendment prohibits state action that deprives a person of life, liberty, or property without due process of law. A person alleging due process violations must first demonstrate that he or she was deprived of a liberty or property interest protected by the Due Process Clause and then show that the procedures attendant upon the deprivation were not constitutionally sufficient. <u>Kentucky Dep't of Corrections v. Thompson</u>, 490 U.S. 454, 459-60 (1989); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 900 (9th Cir. 2002).

A protected liberty interest may arise from either the Due Process Clause of the United States Constitution or state laws. <u>Board of Pardons v. Allen</u>, 482 U.S. 369, 373 (1987). The United States Constitution does not, of its own force, create a protected liberty interest in a parole date, even one that has been set. <u>Jago v. Van Curen</u>, 454 U.S. 14, 17-21 (1981). However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." <u>McQuillion</u>, 306 F.3d at 901 (quoting <u>Greenholtz v. Inmates of Nebraska Penal</u>, 442 U.S. 1, 12 (1979)). In this regard, it is clearly established that California's parole scheme provides prisoners sentenced in California to a state prison term that provides for the possibility of parole with "a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause." <u>Irons v. Carey</u>, 505 F.3d 846, 850-51 (9th Cir. 2007) (citing <u>Sass v. Cal. Bd. of Prison Terms</u>, 461 F.3d 1123, 1128 (9th Cir. 2006); <u>Biggs v. Terhune</u>, 334 F.3d 910, 914 (9th Cir. 2003); <u>McQuillion</u>, 306 F.3d at 903; and <u>Allen</u>, 482 U.S. at 377-78 (quoting <u>Greenholtz</u>, 442 U.S. at 12)). Accordingly, the court must examine whether the deprivation of petitioner's liberty interest in this case violated due process.

It has been clearly established by the United States Supreme Court "that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's

1 decision is not supported by 'some evidence in the record,' Sass, 461 F.3d at 1128-29 (citing
2 Superintendent v. Hill, 472 U.S. 445, 457 (1985)); see also Biggs, 334 F.3d at 915 (citing
3 McQuillion, 306 F.3d at 904), or is "otherwise arbitrary," Hill, 472 U.S. at 457.

"The 'some evidence' standard is minimally stringent," and a decision will be upheld if there is any evidence in the record that could support the conclusion reached by the fact-finder. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994) (citing Cato v. Rushen, 824 F.2d 703, 705 (9th Cir. 1987)); Toussaint v. McCarthy, 801 F.2d 1080, 1105 (9th Cir. 1986). However, "the evidence underlying the [ ] decision must have some indicia of reliability." Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). See also Perveler v. Estelle, 974 F.2d 1132, 1134 (9th Cir. 1992). Determining whether the "some evidence" standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or the weighing of evidence. Toussaint, 801 F.2d at 1105. The question is whether there is any reliable evidence in the record that could support the conclusion reached. Id.

/////

        4)     Discussion

In finding Carey unsuitable for parole, the Board relied upon: a) the circumstances of the commitment offense, b) his unstable social history, c) his criminal history, d) his previous record of violence, and e) his lack of adequate parole plans.

        a)     Circumstances of The Commitment Offense

With respect to the circumstances of the commitment offense the Board stated:

> Our analysis starts with the commitment offense which is certainly worthy of every demonstrative adjective that one can describe to indicate the enormity of the horror of it all. I think that some may say that the victim is lucky to be alive, and you know, hopefully that is true. Certainly, you are lucky that the victim is alive. This offense was carried out in an especially cruel and callous manner. The offense was carried out in we believe a calculated manner in that we believe that the motive for this offense was theft or to cover up theft, that it was not just unchecked rage. You left the

> scene of the incident and then returned. The phone was apparently unplugged. There's much about this offense that supports that conclusion that it was calculated. The victim was certainly abused, defiled, and mutilated during the course of the offense. It was carried out in a manner which demonstrated an exceptionally callous . . . disregard for human suffering.

/////

DN 23 at 85-86.

The circumstances of the commitment offense are one of fifteen factors relating to an inmate's unsuitability or suitability for parole under California law. Cal. Code. Regs., tit. 15, § 2402(c)(1)-(d). When denial is based on these circumstances the California courts have stated that:

> A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can "point to factors beyond the minimum elements of the crime for which the inmate was committed" that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released. [In re] Dannenberg, 34 Cal.4th [1061] at 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783 (Cal.2005). Factors beyond the minimum elements of the crime include, inter alia, that "[t]he offense was carried out in a dispassionate and calculated manner," that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and that "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." Cal. Code. Regs., tit. 15 § 2402(c)(1)(B), (D)-(E)."

/////

Irons, 505 F.3d at 852-53; see also In re Weider, 145 Cal.App.4th 570, 588 (2006) (to support denial of parole, the "factors beyond the minimum elements of the crime" "must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime-circumstances beyond the minimum elements of his conviction-indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety.")

Such circumstances may include "rehearsing the murder, executing of a sleeping victim, stalking," id., or evidence that the defendant "acted with cold, calculated, dispassion, or that he tormented, terrorized or injured [the victim] before deciding to shoot her; or that he

7

gratuitously increased or unnecessarily prolonged her pain and suffering." In re Smith, 114 Cal.App.4th at 367.

The relevant inquiry however "is not merely whether an inmate's crime was especially callous, or shockingly vicious or lethal, but whether the identified facts are probative to the central issue of current dangerousness when considered in light of the full record before the Board or the Governor." In re Lawrence, 44 Cal.4th 1181, 1221 (Cal. 2008); In re Dannenberg, 34 Cal. 4th at 1070-71.

The district attorney present at Carey's hearing told the Board that the victim was struck five or six times in the head with a clawed hammer and that the blood splatter was consistent with the victim being struck from behind while seated. DN 23 at 74. The district attorney also told the Board that blood trails showed that after the attack the victim crawled around his home searching for an operable phone to call for help but that Carey had unplugged the phones. Id.

The Board also read aloud a letter in Carey's C-File, submitted at the time of his sentencing, from a person who claims he "took [Carey] in and gave him a job at my small auto shop in 1994." Id. at 90. That person claims Carey stole more than $3,000 from him and vanished. Id. at 91. The writer goes on to state that:

> The next time I heard about him was when Dan Tichnell, the victim in this case, called me and told me about what he was missing, a gun, jewelry, et cetera. We talked for an hour that night. We were going to turn [Carey] in for his own good. The next day [Carey] heard this and beat Dan with a hammer. Carey lies, cheats, and steals from anyone who helps him.

/////

Id. at 91.

The information provided by the district attorney and the letter indicated that Carey's commitment offense was the result of a cold, calculated attack, in which he unnecessarily prolonged the victim's suffering. After brutally attacking the victim, Carey robbed him and fled the scene, leaving the victim near death and in excruciating pain. DN 23 at 21.

8

1  Hours later he returned only to again flee without calling for help.  Id.  More time passed before
2  Carey eventually turned himself in.  Id.

3  Carey's assault could properly be described as dispassionate and calculated, and
4  as carried out in a manner which demonstrated an exceptionally callous disregard for human
5  suffering.  The Board's conclusions regarding the circumstances of the commitment offense are
6  therefore supported by evidence.  More importantly, the identified facts were probative to the
7  central issue of Carey's then current dangerousness when considered in light of the full record
8  before the Board.  That record included Carey's unstable social history, his criminal history, his
9  previous record of violence, and his lack of adequate parole plans.

          b)     Unstable Social History

11  The Board cited Carey's unstable social history as one factor supporting a finding
12  of unsuitability.  DN 23 at 86.  The Board stated:

> We are further troubled by your prior history which certainly you've discussed your upbringing which is unfortunate and represents certainly a, well, the phrase that is used is a history of unstable or tumultuous relationships with others.  But the bottom line to all that is you had a bad upbringing.  You obviously did not get the guidance that one would hope from, from your parents or from your mother.  Having your mother kill one of your stepfathers in front of you certainly has to be a traumatic incident, and we recognize the trauma connected with all of that.

18  Id.

19  Under California law, one factor tending to show unsuitability for parole is the
20  presence of an unstable social history.  Cal. Code Regs., tit. 15 §2402 (c)(3).  An unstable social
21  history is defined as a "history of unstable or tumultuous relationships with others."  Id.

22  According to the Board Carey described his childhood home as "having a lot of
23  drinking, fighting and abuse."  DN 23 at 30.  When he was twelve he witnessed his mother shoot
24  his stepfather on Christmas eve.  Id. at 53.  Carey was then placed into a foster home where he
25  was beaten and abused.  Id.
26  /////

9

As an adult Carey was convicted of willfully inflicting corporal injury on his wife. Id. at 59. According to a victim letter, Carey stole from a man who had taken Carey in because he was the friend of that man's deceased brother. Id. at 90. A few months prior to the commitment offense Carey separated from his wife and children. Id. at 58. The victim of the commitment offense had been Carey's friend for "a very long time" and let Carey stay with him after the victim found out that Carey was living out of his employer's shop. Id. Carey eventually attacked his long time friend with a hammer.

The Board's conclusion regarding Carey's unstable social history is supported by evidence.

    c)  Criminal History

In finding Carey unsuitable for parole, the Board noted his criminal history, stating:

> We further would indicate that although your criminal history doesn't appear to be extensive, I think the nature of it is instructive in a couple of ways. First of all, your series of continued violations of the driving laws of driving on a suspended license, you know, you had six convictions during the period of January of '91 to '93, one after the other. It's clear that you were aware of the law and consciously decided to continually ignore it during this period of time which is illustrative of someone who chooses [ ] not to comport his behavior with the requirements of law.

DN 23 at 87.

Under California law, the Board is authorized to consider "any other information which bears on the prisoner's suitability for release." Cal. Code. Regs., tit. 15, § 2402(b). Carey's criminal history was not extensive and the driving violations were not serious criminal behavior. Nevertheless, the repeated nature of these minor violations does support the Board's finding that Carey made a conscious decision to violate the law. As the Board noted, he was placed on probation numerous times but continued to commit new violations. DN 23 at 84-85.

The Board's conclusion regarding Carey's criminal history is supported by evidence.

1        d)      Previous Record of Violence

2        While discussing Carey's criminal history, the Board also noted that he had been

3 convicted of inflicting corporal injury on his spouse. DN 23 at 87. The Board stated:

> We think it also important and very relevant is [sic] your prior
> conviction for inflicting corporal injury on a spouse. And certainly
> in discussing that incident with you and hearing your explanation
> of that incident and comparing that to what is contained in the
> probation report, there seems to be some significant contradictions
> between how you described it and how your wife described it.

/////

Under California law, a previous record of violence is one factor that can indicate unsuitability. Cal. Code. Regs., tit. 15, § 2402 (c)(2). A previous record of violence is found where "[t]he prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." Id.

Carey stated that his wife attacked him. DN 23 at 59. In self-defense he held her down causing red marks on her neck. Id. According to him there "was no bruising . . . it was just red marks." Id. According to the Board, Carey's probation report stated he was violating a restraining order and had been "both physically and psychologically abusive and threatening to his wife." Id. A question by the district attorney indicated Carey's wife "sustained injuries to her face and shoulder." Id. at 65.

A prior conviction for willfully inflicting corporal injury on one's spouse is evidence of a previous record of violence. The Board's conclusion regarding Carey's previous record of violence is supported by evidence.

      e)      Inadequate Parole Plans

The Board found Carey's parole plans inadequate noting that his primary resources for employment and residence were from people whom he had never met in person. DN 23 at 94-95. The Board stated:

> Your parole plans, you have submitted letters of support from
> people that you have met, some that you've known before, but we
> find most interesting and concerning frankly is that when

>     addressing your parole plans your primary resource of both a job
>     and of someone with whom professes that they want you to live
>     with them [sic] is someone who hasn't met you, that their
>     communication with you has been on the phone and by your
>     letters, and it's obvious that you have a wide circle of persons that
>     you're able to write letters with and communicate with on an
>     apparently personalized basis, but here you have somebody who
>     wants to take you, and you've never met. That frankly is a
>     concern. Although it's good that you have people that you
>     communicate with, your relationship with someone and work
>     particularly in light of what has been reported in your history is
>     concerning.

/////

Id.

Under California law, the Board is authorized to consider "any other information which bears on the prisoner's suitability for release." Cal. Code. Regs., tit. 15, § 2402(b). Carey had previously assaulted his wife, stole from his employer, and brutally attacked his friend and roommate with a hammer. These victims were people Carey either lived with or were his employer. Carey claimed the hammer attack was precipitated by an argument.

Based on his history, upon parole Carey may find it challenging to learn to live and work well with other people. Roommates and co-workers frequently argue, conceivably more so if they have never met in person. The Board's concern that he had never met the people responsible for his planned residence and employment was appropriate.

The Board's finding that Carey's parole plans were inadequate is supported by the record.

### 4) Conclusion

The circumstances of Carey's commitment offense were probative to his current dangerousness when considered in light of the full record before the Board. That record included Carey's unstable social history, his criminal history, his previous record of violence, and his lack of adequate parole plans.

/////

/////

V.     CONCLUSION

Carey had a traumatic and unfortunate childhood.  However, as an adult he repeatedly and knowingly broke the law and was violent with his wife on at least one occasion.  His commitment offense was a brutal and vicious attack that may have been a cold blooded and calculated attempt to avoid responsibility for his theft.  Carey never sought medical attention for his victim and may have disabled the victim's phones so that he could not get help.  While Carey undoubtedly and understandably focuses on his accomplishments while incarcerated, his parole plans were inadequate, particularly in light of his commitment offense.

Carey's brutal attack was either the calculated attempted execution of a person he had been stealing from or the result of a heated argument between two roommates.  Residing with someone one has never met in person makes it easier to victimize that person and also likely increases the frequency of arguments.  Such a plan is inadequate given Carey's history and the circumstances of his commitment offense.

Based on this record there was evidence to support the Board's conclusion that at the time of the hearing Carey was unsuitable for parole because he was currently dangerous.  The state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established federal law and Carey is not entitled to relief on this claim.

/////

Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised

1  that failure to file objections within the specified time may waive the right to appeal the District
2  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
3  DATED: September 22, 2009

*Charlene H. Sorrentino*
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

14